## STATE OF CONNECTICUT *v.* SAID KENDRICK
### (AC 31896)

Alvord, Bear and Pellegrino, Js.

Argued September 8—officially released December 13, 2011

*James B. Streeto*, assistant public defender, for the appellant (defendant).

*Marjorie Allen Dauster*, senior assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and *David R. Applegate*, assistant state's attorney, for the appellee (state).

*Opinion*

BEAR, J. The defendant, Said Kendrick, appeals from the judgment of conviction, rendered after a jury trial, of criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1). The dispositive issue on appeal is whether the trial court improperly denied the defendant's motion to suppress certain evidence obtained by the police as a result of their warrantless entry into a bedroom where the defendant was found. Because we determine that the warrantless entry was not justified under the circumstances of this case, we reverse the judgment of the trial court.[1]

The jury reasonably could have found the following facts. On the evening of May 12, 2008, New Jersey police contacted the Stamford police department, indicating that they were conducting a homicide investigation, and stating that they had reason to believe a suspect, Malik Singer, was in the area of 239 Knickerbocker Avenue in Stamford. The New Jersey police were led to focus on this particular area by a global positioning system (GPS) "ping" of a cellular telephone associated with their investigation.[2]

---

[1] In addition, the defendant claims that the court improperly instructed the jury on the element of possession. Because we determine that the court improperly denied the defendant's motion to suppress and, accordingly, reverse the judgment of the court on that ground, we do not reach the improper jury instruction claim.

[2] "Cellular service providers typically do not maintain records of the GPS coordinates of cellular telephones operating on their network, but the provider may generate such location data at any time by sending a signal directing the built-in satellite receiver in a particular cellular telephone to calculate its location and transmit the location data back to the service provider. This process, known as 'pinging,' is undetectable to the cellular telephone user." *In re Application of United States of America for an Order Authorizing Disclosure of Location Information of a Specified Wireless Telephone,* United States District Court, Docket No. 10-2188-SKG (D. Md. August 3, 2011).

"Despite the superior accuracy of GPS location technology, however, it is not without limitations. Cellular telephone users may be able to disable GPS functionality and GPS may not work reliably in the event that the receiver's view of satellites is obstructed." Id.

The New Jersey authorities described Singer to the Stamford police as a light-skinned African-American male with tear drop tattoos on his face. The New Jersey police did not provide a photograph of Singer to the Stamford police prior to their arrival in Stamford. In the course of investigating the Knickerbocker Avenue neighborhood, Stamford police were approached by the landlord of 239 Knickerbocker Avenue, who stated that a black male matching Singer's general description had been "keeping company" with a tenant residing in a third floor apartment of his building (apartment). Upon arrival of the New Jersey police in Connecticut, a team of Stamford and New Jersey officers approached and established a perimeter around 239 Knickerbocker Avenue. Although the New Jersey officers had a New Jersey arrest warrant for Singer, the police did not have a Connecticut arrest warrant for Singer or the defendant, nor did they have a search warrant for the apartment.

Between 11 p.m. and midnight, a number of New Jersey and Stamford police officers proceeded to the apartment, knocked on the door, and were met by a tenant, Blanca Valvo. Valvo permitted the officers to enter the apartment. After a period of questioning, Valvo informed the officers that two black males were present in a rear bedroom of the apartment, along with her daughter, Andrea. The New Jersey officers, weapons drawn, entered the bedroom, where they found Andrea Valvo lying in bed with the defendant. Another man, James Spurgeon, was lying on a mattress placed on the floor at the foot of the bed. The defendant reached for something near the bed, and the New Jersey officers, in response, secured the defendant and Spurgeon. After securing the defendant, a New Jersey officer searched the immediate area where the defendant had been reaching and discovered a backpack. The New Jersey officer then noticed what appeared to be—and, in fact, was—the handle of a revolver, sticking out from a pair

of sneakers inside the backpack. The backpack was turned over to the Stamford police, and the defendant and Spurgeon were taken into custody. The defendant subsequently admitted to police that he had taken possession of the backpack and gun at Singer's request and had transported the articles to Connecticut. During the search, neither Singer nor the cellular telephone were found in the apartment.

At trial, the parties stipulated that the defendant previously had been convicted of a felony. The jury found the defendant guilty of criminal possession of a firearm, the court rendered judgment of conviction in accordance with the jury's verdict, and the defendant subsequently was sentenced to a two year mandatory term of imprisonment. This appeal followed. Additional facts and procedural history will be set forth as necessary.

On appeal, the defendant claims that the court improperly denied his motion to suppress certain evidence as the fruit of an unlawful search and seizure.[3] Specifically, the defendant argues that the court erred in concluding that exigent circumstances justified the warrantless entry by police into the bedroom where he was sleeping. The defendant contends that the court's finding of exigent circumstances was based on a chain of speculation that did not rise to the level of a particularized, imminent danger. Furthermore, the defendant

---

[3] Although raising claims under both the federal and Connecticut constitutions, the defendant does not provide an independent analysis under the state constitution demonstrating that he was entitled to greater protection from unreasonable search and seizure. "Because the defendant . . . undertakes no independent analysis of his state constitutional claim, we address only his claim under the federal constitution. See, e.g., *State* v. *Melendez*, 291 Conn. 693, 704 n.16, 970 A.2d 64 (2009); *State* v. *Johnson*, 288 Conn. 236, 244 n.14, 951 A.2d 1257 (2008)." *State* v. *Ryder*, 301 Conn. 810, 817 n.4, 23 A.3d 694 (2011). We note, however, that "the standard of reasonableness governing police conduct under the exigent circumstances doctrine is the same under both constitutions. *State* v. *Blades*, 225 Conn. 609, 623–24, 626 A.2d 273 (1993)." *State* v. *Aviles*, 277 Conn. 281, 287 n.3, 891 A.2d 935, cert. denied, 549 U.S. 840, 127 S. Ct. 108, 166 L. Ed. 2d 69 (2006).

argues that the police did not have a reasonable basis for concluding that Singer was in the apartment.[4] We agree with the defendant.

The following additional facts and procedural history are relevant to our resolution of the defendant's claim. Prior to trial, the defendant moved under the fourth, fifth, sixth and fourteenth amendments to the United States constitution and pursuant to article first, §§ 7 and 8, of the constitution of Connecticut to suppress certain evidence, including the handgun and statements made to the police, as fruit of an unlawful search and seizure. After a hearing, the court issued an oral ruling denying the defendant's motion. In a subsequent written memorandum of decision in which it effectively adopted its oral ruling, the court found that exigent circumstances justified the warrantless entry by police into the bedroom.[5]

---

[4] The defendant does not raise the issue of probable cause to arrest Singer, does not contest that the police were allowed to enter the apartment by consent and does not contest the subsequent search of the backpack found in the bedroom. Moreover, the state does not appear to contest that the defendant had an expectation of privacy in the bedroom where he was found by the police. See State v. Aviles, 277 Conn. 281, 292 n.8, 891 A.2d 935 (overnight guest entitled to expectation of privacy and security from search and seizure absent consent or exigent circumstances), cert. denied, 549 U.S. 840, 127 S. Ct. 108, 166 L. Ed. 2d 69 (2006). Therefore, our review is confined to the issue of whether the court properly concluded that there were exigent circumstances that justified a warrantless entry into the bedroom.

[5] On February 2, 2010, after filing this appeal, the defendant filed a notice that a memorandum of decision on the motion to suppress had not been filed. Rather than provide a signed copy of the transcript from the October 14, 2009 suppression hearing, on March 9, 2010, the trial court filed a written memorandum of decision. The written memorandum provides a chronology of witness testimony and, further, adopts most of the factual findings set forth in the court's oral ruling. There are, however, some discrepancies between the two decisions. Specifically, the trial court's written memorandum of decision interposes new factual findings regarding the cellular telephone information relied upon by the police in their search of the apartment. Neither party has raised an issue regarding these discrepancies, and the defendant has not filed a motion for articulation or rectification in the present matter.

Specifically, the court's written memorandum provides in relevant part: "The court finds that there was no search warrant issued to search the apartment . . . nor was there an arrest warrant secured for the arrest of [the defendant] from any court in Connecticut. However, there was a homicide committed in New Jersey, and the alleged suspect, identified by witnesses as Malik Singer, fled the scene. No handgun was found at or near the scene, and a rational conclusion would be that Singer fled with the gun in his possession.

"The New Jersey police also uncovered a [cellular telephone], registered to the mother of Malik Singer, which a witness said was used by Singer. The [New] Jersey officials secured a subpoena to have the [cellular] telephone company ping the phone, [the result of] which indicated calls to the area of 239 Knickerbocker Avenue. They also were able to secure a warrant for the arrest of Singer within a day after the body of the shooting victim was found at [7 a.m.] on May 11.

"[W]e believe it preferable not to choose between the trial court's conflicting memoranda unless the circumstances objectively indicate a clear and convincing basis for our selection." *State* v. *Wilson,* 199 Conn. 417, 439, 513 A.2d 620 (1986). "On occasion, we will entertain appellate review of an unsigned transcript when it sufficiently states the court's findings and conclusions." *In re Anthony E.,* 96 Conn. App. 414, 417, 900 A.2d 594, cert. denied, 280 Conn. 914, 908 A.2d 535 (2006). Here, however, the trial court provided a signed, written memorandum of decision, satisfying the requirements of Practice Book § 64-1. Accordingly, we will base our analysis on the findings provided in the trial court's written memorandum of decision.

In addition, we must address the scope of the court's factual findings in the written memorandum. The parties disagree as to how the written memorandum should be construed. The state argues that a summary of witness testimony contained in the memorandum is merely a recitation of testimony provided by various witnesses and not the court's factual findings. The defendant argues that the court's recitation of witness testimony amounts to factual findings, evincing the intent of the court to provide a selective chronology of events and root its findings in particular witness testimony. We agree with the state that the court's recitation of witness testimony should not be construed as factual findings. Accordingly, we will only look to that portion of the written memorandum that parallels the court's oral ruling at the suppression hearing in considering the court's factual findings.

"What . . . information the police had led to a conclusion that the shooter, Malik Singer, was a fugitive, that the fugitive was armed, that he was dangerous because he had committed a homicide. The [cellular telephone] ping indicated that the fugitive had connections with a residence in Stamford focusing on the third floor apartment at 239 Knickerbocker Avenue. That building had several small apartments in it and was located in a residential area of small homes close together. As [New Jersey] Detective David Whipple answered, in response to defense counsel's question, it was close to midnight when all this information came together. This state has a doctrine that you do not enter a residence to search for a person or evidence without a search warrant and you do not make arrests for felonies unless committed in the presence of the officer or upon speedy information without an arrest warrant. The police had neither.

"But there certainly existed an exigent circumstance, which is recognized by our courts in the state of Connecticut and by courts in most of the United States. Here, there was reason to believe that the suspect who fled might be in the apartment at the third floor of 239 Knickerbocker Avenue, that he was armed and homicidal, that there were Blanca and [Andrea] Valvo in that apartment and that there were occupants in the other apartments in the building who could be injured if there was gunfire. To get a warrant at midnight would require time and to assemble and place the number of officers that might be needed to secure the safety of the residents in the apartment house and the neighborhood might alert the fugitive and result in his escape or in actual gunfire. Fortunately, the police were able to recover a gun, which Blanca Valvo did not know was in the bedroom and in the possession of the defendant, and in doing so, prevented him from using the weapon or from being shot."

In addition, the following uncontroverted testimony was adduced at the suppression hearing. Whipple testified that "[w]e had reason to believe, during the course of my investigation that at one period of time, Mr. Singer had obtained a [cellular telephone], which was registered to an Ann Marie Pettigrew, which she may have been using during the crime I was investigating." Whipple further testified that the police did not know that Pettigrew was connected with Singer at that time. Whipple, however, testified that he believed Singer was in possession of the telephone. Paul Guzda and Miriam Delgado of the Stamford police, along with Whipple and Luis Demeo of the Somerset County prosecutor's office, also testified that, prior to police entry, the door to the bedroom was slightly ajar and that the bedroom lights were off. Guzda testified that the New Jersey police had an arrest warrant for Singer.

The scope of review when analyzing the application of the exigent circumstances doctrine is well established. "The trial court's finding of facts will stand unless they are clearly erroneous. Its legal conclusion regarding the applicability of the doctrine, however, is subject to de novo review. *State* v. *Blades*, 225 Conn. 609, 617, 626 A.2d 273 (1993). The burden is on the state to establish the facts that justify the application of the exigent circumstances doctrine. See *State* v. *Holmes*, 51 Conn. App. 217, 220, 721 A.2d 1195 (1998) ('[b]ecause a warrantless search is presumptively invalid, the state has the burden of affirmatively demonstrating a recognized exception to the warrant requirement'), cert. denied, 248 Conn. 904, 731 A.2d 309 (1999); see also *State* v. *Badgett*, 200 Conn. 412, 423–24, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986)." *State* v. *Aviles*, 277 Conn. 281, 292, 891 A.2d 935, cert. denied, 549 U.S. 840, 127 S. Ct. 108, 166 L. Ed. 2d 69 (2006). Where, however, a trial court "rules on a motion to suppress without detailing

the facts supporting its decision, an appellate court may look to the evidence produced in support of the ruling." *State* v. *Martin*, 2 Conn. App. 605, 614, 482 A.2d 70 (1984), cert. denied, 195 Conn. 802, 488 A.2d 457, cert. denied, 472 U.S. 1009, 105 S. Ct. 2706, 86 L. Ed. 2d 721 (1985); see also *State* v. *Leonard*, 14 Conn. App. 134, 135, 539 A.2d 1030 (1988), aff'd, 210 Conn. 480, 556 A.2d 611 (1989); *State* v. *Mitchell*, 7 Conn. App. 46, 49, 507 A.2d 1017 (1986) (Appellate Court reviews entire record where trial court's decision makes limited factual findings and legal conclusions), aff'd in part and rev'd in part on other grounds, 204 Conn. 187, 527 A.2d 1168, cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987). "We undertake a more probing factual review when a constitutional question hangs in the balance." *State* v. *Burroughs*, 288 Conn. 836, 843, 955 A.2d 43 (2008).

"It is a fundamental principle of search and seizure law that, in the absence of exigent circumstances and probable cause for arrest, a person's house may not be entered without a warrant, and that warrantless searches and seizures inside a house are presumptively unreasonable. *Payton* v. *New York*, 445 U.S. 573, 586, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980); *State* v. *Guertin*, 190 Conn. 440, 446, 461 A.2d 963 (1983)." *State* v. *Gant*, 231 Conn. 43, 63, 646 A.2d 835 (1994), cert. denied, 514 U.S. 1038, 115 S. Ct. 1404, 131 L. Ed. 2d 291 (1995); see also *State* v. *Mitchell*, 56 Conn. App. 561, 564, 744 A.2d 927 ("[a]bsent exigent circumstances or consent, the police, even armed with an arrest warrant, cannot search for a subject in the home of a third party, without first obtaining a search warrant directing entry"), cert. denied, 253 Conn. 910, 754 A.2d 162 (2000). The principles underlying the presumptive unreasonableness of a warrantless entry into a home "apply with particular intensity when a home is searched in the middle of the night. See *United States* v. *Ravich*, 421 F.2d 1196, 1201

(2d Cir. 1970) (noting the 'peculiar abrasiveness' of nighttime searches (citing *Jones* v. *United States*, 357 U.S. 493 [78 S. Ct. 1253, 2 L. Ed. 2d 1514] (1958))); *United States* v. *Katoa*, 379 F.3d 1203, 1205 (10th Cir. 2004) ('[A] nighttime search is particularly intrusive') [cert. denied, 543 U.S. 1175, 125 S. Ct. 1390, 161 L. Ed. 2d 159 (2005)]; *United States* v. *Ramirez-Chilel*, 289 F.3d 744, 751 n.8 (11th Cir. 2002) (same) [cert. denied, 537 U.S. 1114, 123 S. Ct. 850, 154 L. Ed. 2d 789 (2003)]; *United States* v. *Jerez*, 108 F.3d 684 (7th Cir. 1997) ('[P]olice encounters at a person's dwelling in the middle of the night are especially intrusive.')." *United States* v. *Simmons*, United States Court of Appeals, Docket No. 10-1526-cr (2d Cir. October 26, 2011).

"The term, exigent circumstances, does not lend itself to a precise definition but generally refers to those situations in which law enforcement agents will be unable or unlikely to effectuate an arrest, search or seizure, for which probable cause exists, unless they act swiftly and, without seeking prior judicial authorization. . . . *State* v. *Gant*, [supra, 231 Conn. 63–64]. It is well established in Connecticut . . . that the test for the application of the doctrine is objective, not subjective, and looks to the totality of the circumstances. . . . Specifically, [t]he test of exigent circumstances for the making of an arrest for a felony without a warrant . . . is whether, under the totality of the circumstances, the police had reasonable grounds to believe that if an immediate arrest were not made, the accused would be able to destroy evidence, flee or otherwise avoid capture, or might, during the time necessary to procure a warrant, endanger the safety or property of others. This is an objective test; its preeminent criterion is what a reasonable, well-trained police officer would believe, not what the arresting officer actually did believe. . . . The reasonableness of a police officer's determination that an emergency exists is evaluated on the basis of

facts known at the time of entry. . . . *State* v. *Aviles*, [supra, 277 Conn. 293–94]." *State* v. *Owen*, 126 Conn. App. 358, 365–66, 10 A.3d 1100, cert. denied, 300 Conn. 921, 14 A.3d 1008 (2011).

After reviewing the record, we conclude that, under the totality of the circumstances existing at the time of entry into the bedroom, a reasonable, well-trained police officer would not have had reasonable grounds to believe that Singer was in the bedroom, or that the occupants of the bedroom would flee, destroy evidence, or, in the time necessary to procure a warrant, endanger the safety of others.

Generally, decisions concluding that application of the exigent circumstances doctrine justify a warrantless police entry into a private residence root their holdings, at least in part, on reasonably credible information that a particular suspect will be found on the premises being searched. Such a determination often is grounded in either a police or eyewitness identification of the suspect sought. See, e.g., id., 367 (police witnessed suspect fleeing into house); *State* v. *Mills*, 57 Conn. App. 202, 218, 748 A.2d 318 (police observed defendant in apartment through open window), cert. denied, 253 Conn. 914, 915, 754 A.2d 163 (2000); see also *United States* v. *Snype*, 441 F.3d 119, 133–34 (2d Cir.) (identifying reasonable belief that suspect is present as relevant factor supporting warrantless entry pursuant to exigency), cert. denied, 549 U.S. 923, 127 S. Ct. 285, 166 L. Ed. 2d 218 (2006); *United States* v. *MacDonald*, 916 F.2d 766, 769–70 (2d Cir. 1990) (en banc), cert. denied, 498 U.S. 1119, 111 S. Ct. 1071, 112 L. Ed. 2d 1177 (1991).

*State* v. *Aviles*, supra, 277 Conn. 281, provides a precedent factually similar to the present matter with which to frame our analysis. In *Aviles*, Waterbury police, in the course of investigating a recent homicide, received information from a witness that the suspected killer

was " 'hiding out' " at a particular address. Id., 288. The police had reason to believe that the suspect was armed and dangerous. Id., 291. The police proceeded to the address identified by the witness and were permitted to enter by an occupant of the residence. Id., 288. Upon entry, the police were able to see the defendant through an open door to one of the apartment's bedrooms. Id. The police crossed the threshold of the bedroom, roused the defendant and took him into custody. Id., 288–89. After trial, the defendant appealed the denial of his motion to suppress certain evidence obtained as a result of the warrantless entry by the police into the bedroom where he was staying as an overnight guest.

The Supreme Court in *Aviles* upheld the trial court's decision, concluding that exigent circumstances justified the warrantless police entry into the bedroom. Id., 295. Specifically, the *Aviles* court determined that "a reasonable police officer, having gained legitimate entry to the apartment from *where he saw the defendant* through an open doorway, reasonably would have believed that it was necessary to enter the bedroom to determine whether the defendant, who within the past twelve hours had shot and killed one person with a gun that had not yet been recovered, was still armed and, therefore, posed a continuing danger to human life and public safety." (Emphasis added.) Id., 296.

Here, in contrast, the police were not relying on either their own or an eyewitness' affirmative identification of Singer.[6] The lights in the bedroom were off, the door to the bedroom was slightly ajar and there is no indication in the record that the police could see the occupants of the bedroom. Rather, the trial court's limited findings, the testimony at the suppression hearing and

---

[6] Nor does the record contain any evidence that the 239 Knickerbocker Avenue address was associated with Singer through, for example, utilities statements, a rental agreement, the presence of a known relation, or some other indicia of residency.

the state's position at oral argument reveal the following factors in support of the belief by the police that Singer was present in the bedroom at the time of the warrantless entry: (1) the cellular telephone ping information, (2) the general description given by the landlord and (3) Blanca Valvo's statement that two African-American males were present in the apartment. Under the totality of the circumstances known to the police at the time of their entry into the bedroom, including but not limited to the absence of any specific identification by the landlord or Blanca Valvo of a light-skinned African-American male with tear drop tattoos on his face as one of the persons present in the apartment or the bedroom, we conclude that it was unreasonable for the police to assume that Singer was present in the apartment or the bedroom and posing an imminent threat of harm to its occupants. Accordingly, it was improper for the court to conclude that an exigency justified the warrantless entry.

Thus, although it may be clear that the police had probable cause to believe that Singer had committed the New Jersey homicide, that he was armed and that he posed a continuing threat to others, there is no evidence in the record that persuades us that the police had a reasonable basis to believe that an immediate warrantless entry of the bedroom was necessary. Rather, at the time the New Jersey police entered the bedroom, their belief that Singer was armed, present, and posing an immediate danger to their safety and the safety of those in the residence was premised on a string of attenuated speculation without any positive identification of Singer.

Specifically, although the trial court found that the cellular telephone ping "indicated that [Singer] had connections with a residence in Stamford focusing on the third floor apartment at 239 Knickerbocker Avenue," it does not follow from the court's finding that the ping

established Singer's presence in the bedroom at the time of the police entry. Rather, the record provides that a particular cellular telephone that the New Jersey police believed to be associated with their investigation was located at a particular location—the area of 239 Knickerbocker Avenue—at a time prior to the arrival of the New Jersey police in Stamford. There is no indication in the record, and the court made no finding, that the police utilized "real time" tracking of the cellular telephone. Furthermore, the record does not indicate that the New Jersey police again sought to cause the service provider to ping the cellular telephone either upon their arrival in Stamford, immediately prior to traveling to the apartment, entering the apartment, or entering the bedroom. In addition, there is no evidence in the record that the police questioned Blanca Valvo regarding the cellular telephone or that they attempted to call the telephone while in the apartment in an effort to determine its location. Nor is there any indication in the record that the police ultimately recovered the cellular telephone from the apartment.[7] Even if we were to assume that the police had information establishing that the telephone physically was present in the area of 239 Knickerbocker Avenue at the time of their entry into the bedroom, such information does not establish Singer's presence in the bedroom of Blanca Valvo's third floor apartment.

In addition, the record is inconclusive with regard to Blanca Valvo's reaction when questioned about Singer. Guzda testified at the suppression hearing that he and Delgado explained to Blanca Valvo "who we were looking for, and that we had an arrest warrant; that he was wanted for homicide," and that Blanca Valvo "told us that she did not know what we were talking about. The name did not mean anything to her. And she did tell

---

[7] As previously set forth, the court found that the cellular telephone was registered to Pettigrew, not Singer.

Officer Delgado that my daughter is here, and she had [two] other black male friends with her." Delgado testified that upon learning that Blanca Valvo's daughter was in the apartment with "two friends," she asked Blanca Valvo "if they [were] two black males, and she said yes." Delgado further testified that she did not recall whether anyone asked Blanca Valvo whether she knew Singer. Whipple testified that Blanca Valvo had not told him anything specific about Singer, but that she "indicated that her daughter was in a bedroom with two African-American males." Demeo testified that, once let inside the apartment by Blanca Valvo, "we told her that we were looking for a black male in reference to a case. And she told us that basically, there were two black males in a bedroom with her daughter, in the back of the house—the apartment." Blanca Valvo, herself, testified that the police officers showed her photographs of "some guys that I didn't even know, and says, are you sure you don't know this guy? I said, I don't know, I haven't seen him." We are persuaded from our review of the record that Blanca Valvo never affirmatively identified Singer.

Finally, the landlord's identification provides little support for a conclusion of exigency. According to Guzda's suppression hearing testimony, the landlord told him that a "young lady" who lived in the third floor apartment of 239 Knickerbocker Avenue "was recently keeping company with a black male that basically fit the description of Mr. Singer." Guzda admitted during cross-examination that the description given, however, "could have fit the description of numerous other black males." Moreover, the record does not indicate that the landlord was shown a photograph of Singer, and, aside from the statement that an apartment occupant recently was "keeping company" with an African-American male, there is no indication that the landlord had seen any African-American male matching Singer's general

description enter the third floor apartment that evening. Guzda testified that the landlord was provided with "limited information" because the police "didn't feel comfortable sharing too much with this party."

"The parameters of exigent circumstances are neither so well defined nor so sharply delineated that the phrase may be regarded as a free port of entry for all purposes." *State* v. *Guertin*, supra, 190 Conn. 447. Although direct evidence of an emergency situation is not required to trigger the exigency exception to the warrant requirement; *State* v. *Ryder*, 301 Conn. 810, 830, 23 A.3d 694 (2011); *State* v. *Colon*, 272 Conn. 106, 147, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005); on the basis of the limited facts found by the court and in light of our searching review of the record, we cannot conclude that the state affirmatively demonstrated that a reasonable police officer, given the totality of the circumstances presented at the time of entry into the bedroom, would have determined that exigent circumstances justified either New Jersey or Stamford police officers making a warrantless entry into this darkened bedroom near midnight. The mere presence of two African-American males, neither of whom were identified as Singer and who, at best, answered to a general description applicable to numerous African-American males, combined with the location of a cellular telephone, registered to another individual, that may or may not have been possessed by Singer, fails to provide a reasonable basis for the conclusion that Singer was present in the bedroom at the time of entry. Therefore, we conclude that, under the totality of the circumstances, the police did not have reasonable grounds to believe that an exigency existed at the time they entered the bedroom.

"To discourage unreasonable searches and seizures, the evidence obtained as a direct result of that illegal search or seizure, as well as the fruits, or evidence

derived therefrom, are excluded from evidence, unless the connection between the fruits and the illegal search has been sufficiently attenuated to be purged of its primary taint. *Segura* v. *United States*, 468 U.S. 796, 804–805, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984)." (Internal quotation marks omitted.) *State* v. *Ryder*, supra, 301 Conn. 821. In the present matter, suppression of the evidence seized by the police is warranted.

The judgment is reversed and the case is remanded with direction to grant the defendant's motion to suppress and for further proceedings thereon.

In this opinion the other judges concurred.